**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0155-24

M.J.L.,[1]

    Plaintiff-Appellant,

v.

S.N.,

    Defendant-Respondent.

_____

        Argued May 11, 2026 – Decided May 21, 2026

        Before Judges Natali, Walcott-Henderson and Bergman.

        On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1728-19.

        Michael Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the briefs).

---

[1] We use initials to exclude from public access the identity of individuals referenced in this dispute to maintain the confidentiality of their medical information. R. 1:38-3(a)(2).

S.N., self-represented respondent, argued the cause (Rajeh A. Saadeh and Alex Barrett Dowland, on the brief).

PER CURIAM

Plaintiff, M.J.L, appeals from a September 16, 2024 final judgment issued after a non-jury trial. The judgment memorialized the court's determination of a no cause of action verdict with respect to the defamation claim asserted against defendant S.N., and also granted defendant a $232,327.45 judgment, reflecting $100,000 in compensatory damages, $100,000 in punitive damages, $31,852.45 in prejudgment interest and $475 in costs with respect to her counterclaim for intentional infliction of emotional distress (IIED).

Plaintiff raises only the following three challenges to the court's final judgment. First, she contends the court committed legal error when it denied her application to dismiss defendant's counterclaim of IIED, which plaintiff argues the statute of limitations barred despite the court's finding that its predicate campaign of harassment began in 2015 and continued through 2020. Second, she maintains the court abused its discretion when it reconsidered a motion in limine and admitted certain evidence of that harassment. Third, she contends the court failed to apply properly the New Jersey Tort Claims Act,

A-0155-24

N.J.S.A. 59:1-1 to :12-3 (TCA) as a shield against civil liability. We discern no merit to any of plaintiff's arguments and accordingly affirm the final judgment.

I.

The trial record reflects the following facts which we recount in detail, and at a higher level of granularity than normal, as we deem it necessary to address the nature and gravity of the continuing, egregious conduct perpetrated by plaintiff upon defendant as found by the trial court and further confirmed by the record.

Defendant met L.S. in 2012 or 2013, and their relationship was initially platonic. The same year, she met plaintiff, a psychiatric nurse practitioner at Rutgers United Behavioral Health (UBHC). At the time the parties met, defendant and L.S. were twenty-one years old, and plaintiff was over fifty.

According to defendant, L.S. suffered "from bipolar disorder" and a dependency on oxycodone. Defendant knew L.S. used drugs recreationally, but was not specifically aware he was addicted to opiates. Defendant also knew L.S. was in an "on and off" relationship with plaintiff, and that plaintiff was "very generous" with gifts to him. Plaintiff bought L.S. a car, funded L.S. "tens of thousands of dollars on one trip to Atlantic City," "offered to pay for his college," and paid L.S.'s legal fees in DUI cases. Plaintiff was also "very close

3

A-0155-24

with his family," and loaned L.S.'s mother about $74,000 "for various reasons" including to "pay off her mortgage."

Defendant also maintained plaintiff supplied drugs to L.S. and to his cousin, who was in a relationship with plaintiff's sister. Defendant testified L.S.'s cousin told her he was "grossed out" by L.S.'s relationship to plaintiff, which he perceived to be an exchange of sex for drugs and money. Defendant testified L.S. told her that his relationship with plaintiff "was purely transactional" and "not romantic."

Defendant and L.S. began to date, while defendant grew increasingly aware of L.S.'s drug problem and arrangement with plaintiff. She considered plaintiff to be L.S.'s "sugar momma" who gave him money in return for sex. In 2014, L.S. confessed to defendant that plaintiff was prescribing him oxycodone, and he was addicted to it.

Defendant ended her relationship with L.S. six months later and moved to her mother's home in Virginia. Defendant came from a religious "Palestinian background" that did not approve of dating absent marriage. Her parents were "stricter than perhaps most American parents would be," and gave defendant a "very sheltered" upbringing. For those reasons, when L.S. visited defendant in

4

Virginia and proposed marriage to her, defendant's mother pressured her to accept.

Plaintiff bought L.S. "a train ticket to New Jersey" a week later, but defendant said she and L.S. lived together in Virginia for two or three months. During this time, L.S. continued to use drugs. Defendant did not know where L.S. obtained the drugs, but testified he often traveled to New Jersey for days at a time. Defendant believed L.S. remained desperate for drugs throughout their marriage and ultimately asked L.S. for a separation. L.S. returned to New Jersey while defendant remained in Virginia. The pair never reunited, but remained legally married until defendant filed for divorce in 2018 or 2019.

On or about January 6, 2015, plaintiff filed a criminal complaint against L.S. and defendant. Plaintiff alleged defendant drove L.S. to plaintiff's office, where he stole $200 and a prescription pad; and drove him to a pharmacy, where he used the prescription pad to obtain opiates. When L.S. informed defendant of the complaint, she was still living in Virginia. Defendant believed L.S. committed the theft, but she did not contact the police.

The police discovered that "from 2011 through May 2015," plaintiff "prescribed 96 prescriptions for oxycodone outside" the scope of plaintiff's psychiatric practice. On March 7, 2015, plaintiff told the police there had been

5

"nine fraudulent prescriptions passed on her prescription blanks in the name of Alex Instodder Flasher Florino," and "Alex" was indicted. On March 26, 2015, L.S. told the police plaintiff prescribed him "pain medication . . . even though he was not in pain and she was not his doctor." "He stated he became addicted and received prescriptions from" plaintiff "for oxycodone with the prescription either completed by" plaintiff "or given to him to complete by forging the signature." The ensuing investigation revealed the handwriting on certain oxycodone prescriptions was plaintiff's, and that plaintiff "would not be within the scope of her practice to issue a prescription for pain medications."

In September 2015, the State indicted plaintiff on charges related to fraud; the manufacture and distribution of controlled dangerous substances; and "hindering" or "false information." The State denied plaintiff's request for pretrial intervention. Plaintiff notified the Board of Nursing of the arrest on or about the day it occurred.

The police also arrested L.S. The police did not charge, arrest, question, or contact defendant. Even so, someone—who defendant claimed, and the court found, was plaintiff—began "taunting" defendant by alleging there was an incriminating video that would put defendant "in some kind of crazy trouble." Plaintiff publicly tweeted "images" of defendant "walking in a pharmacy" and

6

stated L.S. would "be the subject of the day." Defendant began to receive messages on Twitter stating: "If you think for one minute you're getting out of stealing my prescription pads with your husband, this is just getting started." Plaintiff contacted defendant "incessantly every single day" to say defendant was "going to be exposed" and that plaintiff wanted defendant dead. These "relentless" messages came from fifteen different Twitter accounts, and plaintiff also sent "14 different messages on Facebook to" defendant's "family and friends." These messages began a campaign of harassment that started in 2015 and lasted through "the pandemic."

Following the tweets in 2015, defendant received messages stating she would not "like the next page." In 2016, plaintiff created multiple Instagram pages with composite images of defendant's face on the "nude" bodies of other women with defendant's "skin tone." One composite image placed defendant's face on a woman's "spread eagle" nude body with "a penis in the mouth." Another had "a vagina flailed open." A third image placed "an eggplant emoji near" defendant's "mouth to indicate" defendant was "engaging in oral sex." These pages had usernames such as "Sara Whore," which rhymes with defendant's name, and the accounts' public-facing "profile photo" would show defendant's face with a penis in defendant's mouth. From these pages, plaintiff

7

A-0155-24

"requested" defendant's friends, coworkers, and family members, including defendant's parents. Defendant's family saw the images and did not know they were composites. Even defendant did not know, at the time, if plaintiff intruded into defendant's home to photograph defendant secretly.

As 2016 continued, plaintiff contacted defendant's mother and sister to tell them defendant was a "criminal," a "thief," and a "homewrecker." Plaintiff sent defendant text messages about "You," a television program about a stalker who murders his victims. Plaintiff continued to tweet about defendant from multiple accounts, one of which had the username "Rutgers58." For example, plaintiff tweeted: "On July 29th your video will be the subject of the day. Why don't you show up? . . . Use your Virginia plates." Plaintiff tweeted a copy of defendant and L.S.'s marriage certificate with the caption: "@S[N.] . . . XOXO, same address on forged Rx to Elmwood Park. I told you I'd see you in court." Plaintiff also tweeted: "@S[N.], you better pray your email address wasn't involved with . . . wire fraud attempts your husband tried with my bank. It's next." Plaintiff continued to tweet about defendant throughout that summer. Defendant's friends saw the tweets.

Using five pictures of defendant and the username "ArabianDollXO," plaintiff created an account on "Seeking Arrangement," a website that permits

A-0155-24

"sugar baby" users "to solicit older men for sex" in exchange for money. Plaintiff gave defendant's phone number or email to men seeking to cheat on their wives with a "sugar baby." At "every time of the day," defendant would receive solicitations for sex "from old men." This "lasted for weeks," and defendant received hundreds of such messages. Defendant felt "worthless," "cheap," and "like I was for sale."

Defendant began "rotating" addresses and changing telephone numbers to avoid plaintiff, but plaintiff "would be aware of every single" such change. Defendant believed plaintiff received this up-to-date information by "conducting some form of a background check." In January 2017, Rutgers UBHC terminated plaintiff and she later went into private practice. That year, plaintiff created "a public Instagram account" impersonating defendant stating, "Stealing your man plus your money." The account posted another composite photograph of defendant's face on another woman's nude body, displaying "a zoomed up, close-up shot of the vagina." Plaintiff began sending messages to defendant's professional connections, including clients and investors. Although defendant had been able to maintain various sales jobs for a time, defendant ultimately needed to seek financial support from her mother and younger sister, L.N., beginning in 2017.

9

A-0155-24

Plaintiff's unrelenting, outrageous conduct continued and, according to defendant, 2018 was "the most distressing" time. L.N. noticed that defendant, who had been outgoing and creative, and once sought to become a lawyer, became withdrawn. After "[Plaintiff] entered her life," L.N. saw defendant become "isolated," reluctant to socialize, and "easily panicked," in particular by unexpected phone calls. L.N. invited defendant to live with her. That January, between 2:00 and 3:00 a.m., plaintiff sent frequent text messages to defendant about the television program "You." Plaintiff sent defendant and L.N. text messages accusing defendant of being "a thief" and sleeping "on an air mattress" in L.N.'s home. Defendant was, in fact, sleeping on an air mattress in L.N.'s home, "which suggested that [plaintiff] had . . . seen inside the windows of the house she was in." Plaintiff sent the two sisters "disgusting" photographs of a man holding a "rat penis." Defendant "became a shut-in" and "wasn't really able to function because" the communication "was so incessant."

L.N. was, in contrast to her sister, "more of a science geek" who had intended to apply to medical school. But although L.N.'s ambitions lay elsewhere, L.N. agreed to start "a real estate business" with defendant.

Plaintiff's messages "graduated to physical threats." Plaintiff sent L.N. about fifteen sexually explicit text messages, such as asking, "does your ass

A-0155-24

come with the home?" "And then she would text" defendant to state: "I'm going to show up at your next showing and F you up." Defendant "feared that [plaintiff] would make an appointment and come and attack her and perhaps kill her." The sisters ended their real estate venture after "about a month" and made about $20,000.

That year, defendant also attempted a "business sales opportunity with" C.L., an "influencer" with 6.7 million followers on social media. Defendant sought to help "connect businesses to him" for "exposure" on C.L.'s popular webpages. Plaintiff told C.L. defendant had "sticky fingers," yeast infections, and "gonorrhea;" was "using" C.L. "for fame and money;" and was "mooching off" L.N. Defendant and C.L. completed one deal and ceased their relationship.

Defendant continued to receive text messages. One message dated March 1, 2018, stated: "You dumb whore. Stop acting like you're a good Muslim girl when you suck dick and get fucked, and not only sucking my man's dick, but everyone else's." On April 2 and 3, 2018, defendant received "incessant" phone calls "in the middle of the night" and other "text messages stating, 'Baby girl, I miss you and that ass. My angel.'" Beginning in June 2018, defendant received "constant" text messages from a self-described "anonymous notification tool" warning that a "sexual partner recently tested positive for an STD" and

A-0155-24

defendant should also get tested. On October 8, 2018, defendant received "a direct message on Instagram" from an account purporting to be L.S.'s then-current girlfriend, stating:

> You bitch. You will still stalk my grave because you want to live in my box. You're obsessed with me. Go find someone who will keep you around longer than a month. [L.S.] abused you and you know that, but talk about me? Do you even have a job or work? Are you done putting up a front? I dare you to even call my job. I will come to your house again. If you come out this time, I will run you over. That's if you don't shoot me since you make threats. Dirty bitch. Go clean your cottage ass and your purple pussy.

Another text message read:

> You're 30 and still no husband. It's because you know no Muslim man will want your rancid vagina. You're an embarrassment to your own kind or any kind because you're an armpit smelling ho that smells like cold cuts in your vagina that's purple roast beef mixed with Victoria's Secret body spray because you're still living off [L.N.]. She kicked you out again last week. Sleep on an air mattress.

On January 31, 2019, C.L. received "an explicit image saying 'Put the whole thing in your mouth? Give me some sugar.'" At the same time, the "incessant" messages and calls to defendant continued. Defendant "would receive thousands and thousands and thousands of messages telling me to kill myself at various times of the day." Defendant used TrapCall, "an app that

12

A-0155-24

detects phone numbers," to trace the messages and calls to plaintiff's number. Some messages contained information that defendant could not tell how plaintiff knew: for example, what home defendant lived in or what car defendant drove. Other messages were ethnically or racially charged, such as one text message sent in January 2019, which stated:

> You're such a ho. You love it. Proud ho who sucks everyone's fat Joe and maybe even their toe if they feed your bum ass. Watch out. You're going to get beat up heffy heifer. You horny hippo ho. I heard more guys explode in you than Gaza, ho. Don't get beat up again.

Defendant received more than one text message mocking defendant for being "on Medicaid" and having an HPV infection, which plaintiff described as having a "purple P-U-S-S." Defendant was taken aback that "the text message I had received had indicated the form of insurance I used and my medical condition." Defendant believed that plaintiff, as a former employee of Rutgers UBHC, would have had access to defendant's medical records, and may have accessed them to discover embarrassing information about defendant.

Up until that point, defendant had not reported plaintiff's communications to the police "every single time" they occurred. Defendant testified "I wanted to extend grace and think that, you know, maybe she's just going through a hard time," or "maybe she's lonely." Defendant also testified that "at this time I was

moving around a lot, which also made it difficult to file reports in different municipalities, and also harassment in general is a difficult complaint just in general to prove." That said, defendant explained when plaintiff's conduct "only grew more aggressive and more concerning, I was left with no choice." Defendant testified that when "you knew my location, you knew the car I drove, you started saying that you want me dead, have I watched the show 'You,' it started becoming really concerning." Defendant did complain to the police in May or June 2019 and ultimately obtained a "no-contact order" against plaintiff.

Defendant also sought mental health treatment in 2019, which defendant had "never required" before. Defendant testified that the only local provider that accepted her insurance, Medicaid, was Rutgers UBHC. Rutgers UBHC was "less than five minutes away" from where defendant lived, and defendant knew plaintiff "was no longer employed there."

On July 8, 2019, defendant enrolled as a patient at Rutgers UBHC. During the "basic assessment," defendant stated: "I've been feeling anxious and paranoid about [plaintiff] harassing my life." Defendant stated that plaintiff "sends her offensive text messages, contacts her employers, and somehow had access to her health records and would disclose information" even "after she divorced her husband at age 24." Defendant described "paranoid thoughts"

14

about the court system; "anxiety, especially for court dates;" loss of sleep; lost work; "strong emotional responses;" and "explosive" behavior.

On or about October 31, 2019, defendant filed a complaint with "the Board of Nursing" putting forth plaintiff's harassment and slander from "2014 through 2019." Defendant attached a "not identifiable" but large number of text messages. Plaintiff testified the report accused her of: making "countless fake Instagram accounts, dating accounts, . . . pornographic photos," texts, and telephone calls; and contributing to defendant's "ex-husband's legal trouble . . . by prescribing opiates, although he was never" plaintiff's patient. The report also accused plaintiff of "illegally" accessing defendant's "medical records" to discover and reveal "embarrassing medical information" about defendant.

Defendant testified plaintiff's harassment continued through "the pandemic." Defendant attended appointments at Rutgers UBHC on March 23, 2020; March 23, 2021; April 8, 2021; May 19, 2021; July 26, 2021; and August 24, 2021. On April 8, 2021, defendant explained to the Rutgers UBHC therapist that she had "been avoiding individual therapy" because "she's being stalked by a mental health professional."

Defendant was diagnosed with post-traumatic stress disorder (PTSD), depression, "general anxiety disorder," insomnia, and "binge eating." These

15

diagnoses resulted from various psychological harms defendant had suffered since plaintiff's activity began, including: weight gain; nightmares; dissociation; flashbacks; feelings of embarrassment, isolation, shame, and helplessness; outbursts of anger; trust issues; an inability to socialize; and feelings that she was unable to support L.N., who had cancer at the time of trial. Defendant also received therapy and prescriptions for several medications including antidepressants, anxiety medication, and "Vyance for binge eating, which is something [plaintiff] would constantly shame me for, is the 50-pound weight gain in the past few years."

Doctor Roy Lubit testified at trial "as an expert in psychiatry and emotional trauma." Lubit opined defendant "meets the criteria for major depression" and chronic PTSD. PTSD involves a panoply of symptoms including "allostatic attrition, which . . . means that the person's ability to deal with a certain stressor decreases." Allostatic attrition created "secondary problems" for defendant such as social withdrawal, binge eating, irritability, and shame. Additionally, a "lack of trust is classic" in PTSD patients, "and it is a huge issue, because that leads to withdrawal, failure to get medical care." Lubit explained another symptom of the illness is "[l]earned helplessness," meaning

> the individual loses the ability often to protect
> themselves, that they start questioning themselves,

16

wondering is it their fault, which is actually one of the symptoms that often occurs, is the person starts blaming themselves and thinking what's wrong with me? Why did this happen to me? What have I done that caused this? And it's a pretty serious symptom.

In Lubit's opinion, defendant "has not improved over time despite therapy and despite time and she is continuing to suffer a great deal." Although Lubit would hope "that things were going to go better" with therapy, "they haven't." "Prognosis is unfortunately poor, because after ten years, it's greatly weakened her." Lubit opined defendant will "indefinitely" suffer damage to "cognition and memory and ability to think." "The proximate cause" of all this damage would be "the harassment, which she reports to me she suffered at the hands of [plaintiff]."

Lubit opined defendant requires a "well trained" doctor to conduct years of "intensive trauma therapy," but even with therapy, defendant will "probably need to be on medication the rest of her life." "This many years of depression and PTSD leave ongoing changes in the brain." "And we know that people who have suffered especially complex trauma as she has, that they have far more medical problems as time goes on." Lubit also recommended "couples therapy to try to undo some of the damage to" defendant's current relationship. And

17

defendant "needs help with her weight," requiring "a nutritionist and" a "gym membership."

Lubit estimated the cost of defendant's therapy, going forward, to be "about $180,000." Defendant's psychopharmacology appointments and medication will cost about $80,000. Couples therapy will cost about $30,000. Lubit did not estimate the cost of a nutritionist or gym membership

As noted, the court found there was an "overwhelming amount of evidence" proving "very clearly and certainly" that plaintiff "was the person behind the series of severe, outrageous communications." The court premised this conclusion on: the communications themselves, which sometimes referenced events only plaintiff knew of; the social media usernames of the harassing accounts, which sometimes contained plaintiff's name; the syntax and word choice in some messages, which suggested someone pretending to be younger and/or Middle Eastern; plaintiff being "perhaps the only person who would have had the motive" for this conduct; references in the messages to seeing defendant before a judge; L.N.'s credible testimony that she spoke with plaintiff on the phone, and then identified plaintiff at trial; C.L.'s credible testimony that plaintiff called him and "introduced herself by name" before texting him from several "bogus" numbers; defendant's testimony that she

A-0155-24

identified plaintiff's telephone number with an app called TrapCall; anonymous or impostor social media accounts that responded when defendant called them by plaintiff's real name; and that in 2019, defendant obtained "a no-contact order against [plaintiff] . . . , and magically the communications" generally "stopped."

II.

In her first argument, plaintiff contends the court erred by applying the continuous tort doctrine to permit "defendant to base her claims on conduct that occurred outside the two-year statutory period." Plaintiff maintains defendant should not have been able to recover for "conduct that occurred before February 3, 2018" because the continuing violation doctrine applies only "to workplace discrimination and harassment claims." Alternatively, plaintiff contends the facts did not demonstrate plaintiff's "wrongful acts" were "so interconnected and continuous that they cannot be separated into discrete actionable events but, rather, are parts of one alleged wrong."

We disagree with all of these arguments. First, we reject plaintiff's legal argument that the continuing violation or continuous tort doctrine applies only to workplace discrimination and harassment claims. Second, contrary to her factual argument, the trial record, which we recounted above, indisputably established plaintiff's actions were part of an interconnected and continuous

19

campaign of harassment which permitted defendant to recover damages for such conduct.

Plaintiff raised the issue on the third day of trial when she made a "motion to dismiss" which the court found was "in reality . . . a motion to exclude evidence under the [c]ontinuing [t]ort [d]octrine." The court apparently reserved judgment on the motion at that time and addressed it "within" its ultimate decision on plaintiff's claims and defendant's counterclaims. In that decision, the court considered "the statute of limitations for bringing" an IIED claim that alleged plaintiff waged "a years-long campaign, primarily from approximately 2016 into 2019 . . . of harassing phone calls, text messages," and offensive, "disparaging and false social media posts." The court recited that N.J.S.A. 2A:14-2 provides "general torts which include the claims of intentional infliction of emotional distress are governed by a two-year statute of limitations."

In rejecting plaintiff's application, the court relied on an unpublished decision from our court which "analyzed a similar issue and . . . also recognized that the [c]ontinuing [t]ort or [c]ontinuing [v]iolation [d]octrine provides an exception to the statute of limitations for the claim of intentional infliction of emotional distress." The court explained that the unpublished authority "also

observed that when an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the action ceases."

Accordingly, the court held "as far as the beginning of that statute of limitations period, it would begin running from the date that the pattern of tortious conduct ceases." The court found in this case, defendant's proofs established "the statute of limitations would not have even begun running until some point 2019 [sic] at its earliest" and "would not close until some date in 2021." "[Defendant] instituted suit on her counterclaim for intentional infliction of emotional distress in February of 2020, well within the statute of limitations period."

The court also held defendant's IIED claim succeeded, given: there was an "overwhelming amount of evidence" proving "very clearly and certainly" that plaintiff "was the person behind the series of severe, outrageous communications;" plaintiff's "campaign of mental torture was extremely egregious;" defendant suffered damages "as a direct and proximate result of the years-long campaign of harassment;" and "the emotional distress was so severe that it genuinely would have caused substantial emotional distress and mental harm to the average person."

21

The court recited defendant sought compensation for emotional distress; pain and suffering; economic losses, including lost income; "medical expenses, including the future medical expenses"; out-of-pocket expenses; and punitive damages. As noted, the court awarded defendant $100,000 in general damages, and $100,000 in punitive damages. The court did not award damages for defendant's economic losses or medical expenses.

The court awarded defendant "actual general damages" to compensate for "the pain and suffering caused by the intentional infliction of emotional distress." The court found defendant's own testimony established "the mental anguish, pain and suffering she endured for several years and which she still experiences." The court also found Lubit's testimony established defendant suffers "from chronic post-traumatic stress disorder" with "severe and permanent" damages and a "poor" prognosis "given the length of time she has had to endure the stress." The court explained for these reasons and based on the "proofs presented, this Court finds that the award of $100,000 is the amount of money to adequately compensate" defendant "for the damages caused by plaintiff's intentional conduct."

The court also awarded punitive damages. The court found plaintiff had "specialized training and years of experience in the field" of psychiatry and

22

"employed it as a weapon to attack the person whom she blamed for causing her loss of her romantic partner" as well as "for her legal troubles including criminal arrest, prosecution, and conviction." "When a person trained to help people with mental health issues does everything in her power to torment another person over a long and repetitive campaign," the court found that person knows "the likelihood that serious harm would result." The court credited L.N.'s testimony that defendant's "personality and demeanor changed for the far worse the longer [plaintiff] tortured her." The court also credited defendant's testimony "that she started questioning whether [plaintiff] was right about her."

The court declined to award defendant "any special or economic pecuniary losses" because defendant "failed to demonstrate any such damages by a preponderance of the evidence." The court also declined to award "the calculated medical expenses" because defendant "failed to present any quantum of proof as to that amount of money expended solely for medical treatment related to the emotional distress caused by [plaintiff], and" Lubit's "calculations as to what her future mental health treatment would cost" were "very speculative," given it "appeared that the calculations were being made right from the witness stand rather than based on a sound and reasoned analysis."

A-0155-24

We review a court's factual findings under a deferential standard, <u>Balducci v. Cige</u>, 240 N.J. 574, 595 (2020), and defer "to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions," <u>In re Twp. of Bordentown</u>, 471 N.J. Super. 196, 217 (App. Div. 2022) (quoting <u>Griepenburg v. Twp. of Ocean</u>, 220 N.J. 239, 254 (2015)). We do not disturb the court's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." <u>Ibid.</u> (quoting <u>Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.</u>, 65 N.J. 474, 484 (1974)); <u>accord</u> <u>Gnall v. Gnall</u>, 222 N.J. 414, 428 (findings "by a trial court are binding on appeal when supported by adequate, substantial, credible evidence.").

We review "questions of law," including "the application of a statute of limitations," however, under a de novo standard. <u>Smith v. Datla</u>, 451 N.J. Super. 82, 88 (App. Div. 2017). A "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

Finally, to any extent plaintiff is appealing from an evidentiary decision, such "decisions are reviewed under the abuse of discretion standard . . . . " Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384 (2010).  "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'"  State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)).  A "functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue."  R.Y., 242 N.J. at 65 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

To recover for IIED, a party must show (1) intentional or reckless conduct "(2) outrageously and (3) proximately caused (4) severe distress."  G.D. v. Kenny, 411 N.J. Super. 176, 194 (App. Div. 2009); accord Tarr v. Ciasulli, 181 N.J. 70, 77 (2004).  The conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)).  In addition, "the emotional distress suffered . . . must be 'so severe that no reasonable [person]

could be expected to endure it.'" Ibid. (alteration in original) (quoting Restatement (Second) of Torts § 46, cmt. j).

IIED claims have a two-year statute of limitations. N.J.S.A. 2A:14-2. The limitations period generally serves "to cut off a claim that is filed more than two years after the complained-of" conduct. Roa v. Roa, 200 N.J. 555, 566 (2010). This doctrine reflects the "unfairness and injustice which stem from litigation based on distant circumstances and faded memories." Tevis v. Tevis, 79 N.J. 422, 430-31 (1979).

Time passing between the accrual of a claim and the filing of a complaint may threaten a party's "fair opportunity to defend" against the claim. Id. at 430. Limitations periods thus seek to protect this opportunity and "promote repose by giving security and stability to human affairs." O'Keeffe v. Snyder, 83 N.J. 478, 490-91 (1980) (quoting Wood v. Carpenter, 101 U.S. 135, 139 (1879)). Hence, "considerations of individual justice as well as the broader considerations of repose coincide to bar" the action of a claimant who "voluntarily sleeps on his rights." Ferdinandi v. Strully, 35 N.J. 434, 438 (1961).

"The continuing violation doctrine" may offer "an exception to that limitations period." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 18 (2002). The doctrine provides that when a claimant "is subject to a continual,

26

cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." Wilson v. Wal-Mart Stores, 158 N.J. 263, 272 (1999). That is, although the limitations period for a tort claim is generally two years, N.J.S.A. 2A:14-2, the continuing violation doctrine provides "the entire claim may be timely if filed within two years of 'the date on which the last component act occurred,'" Alexander v. Seton Hall Univ., 204 N.J. 219, 229 (2010) (quoting Roa, 200 N.J. at 567).

"The doctrine is based on the premise that the conduct becomes tortious and actionable precisely because 'of its continuous, cumulative, synergistic nature.'" Bolinger v. Bell Atl., 330 N.J. Super. 300, 306 (App. Div. 2000) (quoting Wilson, 158 N.J. at 273). It permits "the aggregation of acts, each of which, in itself, might not have alerted the" claimant "of the existence of a claim . . . ." Roa, 200 N.J. at 569.

Over 100 years ago, without giving this rule an explicit name, the Court of Errors and Appeals recognized a defendant's "persistence in" a "wrongful" trespass left a claimant "entitled to recover" for harm suffered outside the bounds of the limitations period. Morey v. Essex Cnty., 94 N.J.L. 427, 430 (E. & A. 1920). In that case, the defendant constructed part of a highway on plaintiffs' land "in direct violation of the property rights of plaintiffs." Id. at

27

428.  The plaintiffs brought suit outside the statute of limitations, but the court instructed the "jury that the statute of limitations was no bar to the action . . . ." Id. at 430.  The Court of Errors and Appeals affirmed.  Ibid.  It held the "right of action of the plaintiffs does not rest entirely upon the original tortious entry and partial destruction of their property, but upon the continued occupation and user of the property by the defendant following the original entry."  Ibid.  "In other words, the constant repetition of the defendant's unlawful acts, its persistence in its wrongful occupation of plaintiffs' land, constituted continuous trespass, and the plaintiffs were entitled to recover from the defendant the damages sustained by them for all six years" before plaintiffs ultimately filed suit.  Ibid.

This court later described the rule in Morey as "the concept of continuing wrong . . . ."  Stanley Dev. Co. v. Millburn Twp., 26 N.J. Super. 328, 331-32 (App. Div. 1953).  In Stanley, the defendant installed a "storm sewer" that blocked an adjoining parcel of land from accessing or using the nearby "sanitary sewer . . . ."  Id. at 330.  Thirty-seven years after both sewers were constructed, the plaintiff took title to the adjoining land and constructed "another outlet" to the blocked sanitary sewer.  Id. at 330-31.  The plaintiff brought suit to recover its construction costs, arguing it had a viable claim under Morey.  Ibid.  This

court declined to apply <u>Morey</u>, finding the plaintiff did not allege "a trespass" or demonstrate damages. <u>Id.</u> at 331. In dicta, the panel noted that "even where the concept of continuing wrong has been applied, recovery is ordinarily permitted only with respect to damages sustained during the period of limitations preceding the suit." <u>Id.</u> at 331-32.

While <u>Stanley</u> suggested <u>Morey</u>'s rule was limited to trespass actions, this court and the Supreme Court proceeded to recognize the doctrine—which this court called "the concept of 'continuous tort'"—in other circumstances, such as a continual "inverse condemnation," "negligent representation by an attorney," or "course of negligent treatment by a physician . . . ." <u>Giovine v. Giovine</u>, 284 N.J. Super. 3, 37 (App. Div. 1995) (citing <u>Russo Farms, Inc. v. Vineland Bd. of Educ.</u>, 280 N.J. Super. 320, 327-28 (App. Div. 1995); <u>Aykan v. Goldzweig</u>, 238 N.J. Super. 389, 392 (Law Div. 1989); <u>Tortorello v. Reinfeld</u>, 6 N.J. 58, 66 (1950)).

In <u>Russo Farms</u>, the plaintiff farmers alleged "the improper siting and construction of a public high school across the street" caused the farm to flood. 280 N.J. Super. at 323-24. The flooding began before August 1987, ended "by May 1990," and in July 1990, the farmers filed a complaint against defendants alleging, among other claims, inverse condemnation. <u>Id.</u> at 326. The trial court

granted defendants summary judgment "on the ground that every claim was barred by a statute of limitations, a statute of repose, or the notice provisions of the Tort Claims Act." Id. at 324. We reversed. Id. at 331. The decision noted a "separate cause of action" for inverse condemnation "accrued with each incursion of floodwater." Id. at 326. The decision adopted the dicta in Stanley by holding that even "where the concept of continuing wrong has been applied, recovery is ordinarily permitted only with respect to damages sustained during the period of limitations preceding the suit." Id. at 328 (quoting Stanley Dev. Co., 26 N.J. Super. at 331-32).

Language used in the "continuous tort" cases, such as Morey and Russo Farms, generally mirror the standards formulated in the "continuing violation" cases, such as Wilson and Roa. Compare Morey, 94 N.J.L. at 430 (recovery for "constant repetition of the defendant's unlawful acts" beyond limitations period) with Wilson, 158 N.J. at 273 (recovery for "continuous, cumulative, synergistic" acts beyond limitations period); compare Russo Farms, 280 N.J. Super. at 326 (a "separate cause of action accrued with each incursion of floodwater") with Roa, 200 N.J. at 569 (citation omitted) (each "discrete . . . act starts a new clock for filing charges alleging that act.").

As such, we accept that the line of "continuous tort" cases apply to this case so long as defendant can demonstrate a "constant repetition of . . . unlawful acts." Morey, 94 N.J.L. at 430. On this point, the court's factual findings that plaintiff's conduct involved the constant repetition of wrongful acts are overwhelmingly supported by the trial record.

By way of summary, plaintiff accused defendant of being a criminal or thief in 2015, and 2016, and 2018. Plaintiff taunted defendant on social media in 2015, in 2016, and until at least 2017. Plaintiff contacted defendant relentlessly and at inconvenient hours beginning in 2015, throughout 2018, and in 2019. These communications often suggested a racial or ethnic hostility, such as the "ArabianDollXO" username on Seeking Arrangements, the text telling defendant to stop "acting like you're a good Muslim girl" in 2018, and the text stating "more guys explode in you than Gaza" in 2019. Plaintiff degraded defendant sexually by making and broadcasting composite photographs of defendant's face on other women's nude bodies in 2016 and 2017, creating a "sugar baby" profile on Seeking Arrangements, texting defendant warnings about sexually transmitted diseases in 2018, and mocking defendant's HPV diagnosis in 2018 and 2019. Throughout all of 2015, 2016, 2017, 2018, and 2019, plaintiff contacted defendant's family, friends, and professional

connections seeking to frighten or humiliate defendant. The "incessant" nature of these communications was the reason defendant gave for becoming "a shut-in" who was unable to function. Given "the constant repetition" and "persistence" of plaintiff's wrongful acts, we are convinced the continuous tort doctrine permitted defendant to bring the IIED claim based on conduct occurring before February 2018. Morey, 94 N.J.L. at 430.

Further, the court's damages award was entirely consistent with the holding in Russo Farms that "recovery is ordinarily permitted only with respect to damages sustained during the period of limitations preceding the suit" in continuous tort cases. 280 N.J. Super. at 328 (quoting Stanley Dev. Co., 26 N.J. Super. at 331-32). The court premised its award of damages on the "severe" pain and suffering defendant "still experiences" and which has caused "permanent" damage to defendant with a "poor" prognosis, which defendant necessarily suffered within the limitations period.

We note as a matter of policy that defendant suffered "[l]earned helplessness" due to PTSD, and complained of "paranoid thoughts" about the court system following the harassment. Because the record demonstrated defendant did not "voluntarily" sleep on her rights, we also conclude the policy

32

considerations underpinning our limitations periods would not be served by barring this claim. Ferdinandi, 35 N.J. at 438.

IV.

We next consider, and reject, plaintiff's argument that the court committed error when it ostensibly granted her motion in limine to exclude evidence, only to later rely on those proofs when considering the timeliness of defendant's IIED claim. Specifically, plaintiff maintains defendant attempted to marshal unauthenticated text messages, but then later withdrew the "request to admit" them.

First, we stress that the court never granted plaintiff's motion in limine. The court originally ruled the issue was moot, but after trial, the court reconsidered the motion and denied it, which Rule 4:25-8(d) expressly permitted the court to do. In the alternative, even if it was error for the court to admit the three messages plaintiff highlights on appeal, it was not plain error given the overwhelming evidence against plaintiff in this matter.

Before trial, plaintiff moved in limine to exclude certain text messages and social media posts, asserting—among other things—that because many of the text messages came from "random" phone numbers, they could not be authenticated without metadata. Exhibit A to the motion, condensed into eight

pages of plaintiff's appendix, contained two screenshots of social media posts and about thirty-six text messages. At oral argument, the defense "withdrew their intention to utilize those text messages," citing difficulties obtaining their metadata, and the court ruled the motion was "moot."

The court noted the withdrawal and said defense counsel "stipulate[d] that those text messages will not be admitted into evidence." The court held "that motion moot" and informed plaintiff that "by bringing that motion, that would have meant that you also would not be able to reference those text messages." Later that day, the court reiterated the motion in limine to exclude text messages and Twitter screenshots was moot because "defendant withdrew their intention to utilize those text messages." In its ultimate decision, by contrast, the court held: "There was a motion in limine by the plaintiff filed July 8th to exclude the defendant's texts and the Twitter screenshots. That motion is denied. That material had been provided and, in fact, that material was utilized effectively by the plaintiff during the course of the trial."

This court reviews the trial court's rulings on "in limine motions adjudicating the admissibility of evidence" for an abuse of discretion. Primmer v. Harrison, 472 N.J. Super. 173, 187 (App. Div. 2022); accord Brenman v. Demello, 191 N.J. 18, 31 (2007). "A court abuses its discretion when its

A-0155-24

'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Chavies, 247 N.J. at 257 (quoting R.Y., 242 N.J. at 65). A "functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." R.Y., 242 N.J. at 65 (quoting Flagg, 171 N.J. at 571).

A motion in limine is a "pretrial request that certain inadmissible evidence not be referred to or offered at trial." Black's Law Dictionary 1109 (9th ed. 2009); accord Conforti v. County of Ocean, 255 N.J. 142, 170 (2023). Rule 4:25-8, which governs motions in limine, provides the "court shall rule on all motions submitted under this rule in a timely manner based on the issue raised in the particular motion." R. 4:25-8(a)(4). That said, a "trial court's ruling on a motion in limine shall not preclude the court from reconsidering or modifying that ruling, sua sponte or at the request of a party, based on later developments at trial." R. 4:25-8(d). And while it did not expressly remind plaintiff of this provision at the time of its initial ruling, the court did inform plaintiff, on a separate motion in limine not appealed, that the ruling was open to reconsideration.

Plaintiff accuses the court of legal error by granting the motion and then denying it. That did not happen: the court never granted the motion, and repeatedly stated it was moot. But even if the court had taken the action plaintiff described, it did not constitute reversible error. The Court Rules permit the court to reconsider or modify a ruling "based on later developments at trial," as the court stated it had done here. R. 4:25-8(d).

In any event, even accepting plaintiff's argument that the court erred, it did not constitute plain error. A predominant theme of defendant's trial testimony was that someone sent "incessant," and ultimately perhaps "thousands," of antagonistic text messages to her "on a daily basis." Defendant's extensive recitation of these messages included a description (but not a full quotation) of certain text messages accusing her of having HPV, described as a "purple P-U-S-S;" being "broke" or jobless; and using Medicaid. Exhibit A did contain similar messages, but according to defendant, these were representative of many others she received across a period of years. Plaintiff did not object to this description when defendant offered it, and later in the trial, herself marshaled text messages which read: "You should take yourself to get checked for your pussy. . . . You have HPV . . . and a purple pussy and the purple cow

36

nipples." Otherwise, our review of the trial indicates the exact messages in Exhibit A were kept out of the record.

Regarding the supposedly random phone numbers from which those text messages emanated, defendant testified she believed plaintiff used a "third-party application to change her number" so that text messages would seem to pour in from anonymous strangers, L.S.'s new girlfriend, or a "notification tool" for STI diagnoses. Yet, defendant explained she knew plaintiff authored these messages because of "the context" they arrived in; because they "stopped once the case started;" and because they were written in a consistent voice, often repeating uncommon phrases like "heifer" or "purple pussy." Defendant explained:

> I know it's [plaintiff]. I don't know if I'm allowed to say that, but I know it's [plaintiff] because the wording on all of [plaintiff]'s messages to me are always redundant. She always says that I put my hands in people's wallets. She always says I'm a whore. It's always redundant. And there's hundreds of other messages where she repeats the exact same claims dating from 2015.

Later, by way of another example, defendant pointed out that some of the anonymous text messages would use the word

> "Vallaj," which is the Albanian way to say "Vallei," (phonetic) which means I swear to god, which is a very interesting thing. . . . I have many Albanian Muslim friends and never have I heard them referring to swearing to God and telling someone to kill themselves

in the same sentence.  So it's obvious that's not coming from someone who is an Albanian or of Muslim descent

. . . .

BY [PLAINTIFF]:

Q    You're aware I'm not Albanian, correct?

A    Yes, I'm aware.

That is:  defendant testified the misuse of an Albanian Muslim oath indicated the anonymous author of these text messages was not Albanian, and plaintiff then elicited testimony that <u>she</u> was not Albanian.

On appeal, plaintiff argues it was error for the court to grant the motion in limine, then deny the motion in its final decision, and so rest its holding on a tweet, an Instagram message, and a text message not included in Exhibit A but "essentially the same" as those in Exhibit A.  The tweet read:  "If you think for one minute you're getting out of stealing my prescriptions with your husband . . . just getting started."  The Instagram message read:  "Donnie [sic] abused you and you know that" and "I dare you to even call my job.  I will come to your house again.  If you come out this time, I will run you over.  That's if you don't shoot me, since you make threats, dirty bitch."  The text message read:  "You fucked him for my money, you slut.  You are basically my hooker."

A-0155-24

Apart from not including these writings in Exhibit A, plaintiff did not object to their admission at trial, and does not claim to have done so on appeal. As such, the plain error standard governs review. R. 2:10-2. That standard provides any "error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." Ibid.

Given the overwhelming nature of the remaining evidence against plaintiff—including evidence regarding the voluminous number of similar text messages sent to defendant, L.N., and C.L., whose admissibility plaintiff does not contest—the three she highlights on appeal were not clearly capable of producing an unjust result. Cf. State v. Sui Kam Tung, 460 N.J. Super. 75, 98-99 (App. Div. 2019) (under the plain error standard, "a reviewing court may consider whether, absent the evidence admitted in error, there was overwhelming evidence of the defendant's guilt.").

V.

Finally, plaintiff argues the court erred by failing to find the TCA immunized her from civil liability. Plaintiff contends that immunity applied because defendant premised her counterclaim "in part on" an allegation that plaintiff wrongfully retrieved defendant's medical records while employed at

Rutgers UBHC. Plaintiff also argues defendant failed to show plaintiff's "conduct was outside the scope of her employment or willful, wanton, or grossly negligent" as required to bring the counterclaim beyond the TCA's scope. In addition to disagreeing with these arguments as a matter of law, we note the court declined to find plaintiff accessed defendant's medical records.

As noted, defendant alleged that plaintiff, as a former employee of Rutgers UBHC, accessed defendant's medical records to discover, and later disseminate, embarrassing information about defendant. Plaintiff filed a pre-trial motion to dismiss, which stated the TCA "covered" both the "public entity" holding defendant's medical records and plaintiff, as an employee of that entity.

The court's final decision noted defendant testified "the person harassing her was putting information into the social media posts that could only have come from her medical records," and defendant also testified plaintiff had "access to medical records" as an employee of Rutgers UBHC. From these premises, defendant "deduced and argued that it had to be [plaintiff] who somehow accessed" the medical records. Yet, the court rejected that deduction, concluding the evidence "hardly amounts to any level of proof" necessary "to make the leap of faith to conclude that there could be no one else who could have accessed those medical records other than [plaintiff], and then the

additional leap of faith to conclude that the shared information could have only come from [defendant's] medical records."

On appeal, plaintiff presented us with selective quotes from the court's recitation of defendant's testimony, but omitted the paragraphs which immediately follow it, in which the court explicitly rejected the inferences defendant urged it to make. The court held the IIED claim succeeded notwithstanding defendant's unproven allegation regarding the medical records, not because of the allegation. It rejected the one fact which would, per plaintiff's argument, implicate the TCA.

Additionally, we note plaintiff's conduct was clearly outside the scope of her employment. See Velez v. City of Jersey City, 358 N.J. Super. 224, 239 (App. Div. 2003) (quoting N.J.S.A. 59:3-14) ("Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice, or willful conduct."). As the trial court articulated, plaintiff had "specialized training and years of experience in the field" of psychiatry and "employed it as a weapon to attack the person whom she blamed for causing her loss of her romantic partner" as well as "for her legal troubles including criminal arrest, prosecution, and conviction." "When a person trained to help people with

mental health issues does everything in her power to torment another person over a long and repetitive campaign," that person knows "serious harm" would likely result.

To the extent we have not addressed the remaining arguments raised by plaintiff it is because we have determined they lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hasley

Clerk of the Appellate Division

42